ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| KIMBERLY MILLÁN FLORES Y OTROS<br><br>Recurridas<br><br>v.<br><br>TRANSPORTE LEÓN, LLC Y OTROS<br><br>Peticionarias | KLCE202400263 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Civil núm.: SJ2020CV06038 consolidado con SJ2020CV06113<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidenta, la juez Barresi Ramos, la jueza Santiago Calderón y el juez Campos Pérez

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de abril de 2024.

Comparece la parte demandada y peticionaria, Super Asphalt Pavement Corp. y Asphalt Solutions Toa Alta, LLC (en conjunto, Asphalt), mediante un recurso de *certiorari.* Solicita que revoquemos la *Resolución* emitida por el Tribunal de Primera Instancia, Sala de San Juan (TPI), el 18 de enero de 2024, notificada al día siguiente. En el asunto que nos atañe, a través del referido dictamen, el TPI declaró No Ha Lugar una solicitud consolidada de sentencia sumaria presentada por Asphalt. En consecuencia, el TPI se negó a desestimar las causas de acción instadas por la parte demandante y recurrida, conformada por Cynthia Y. Esterás Nieves, Manuel Ruiz, Josué Esterás Nieves, Alicia Nieves y José Esterás (en conjunto, Esterás-Nieves) y Manuel Neris Adorno y Virginia Ríos Rivera (en conjunto, Neris-Ríos).

Anticipamos que, por los fundamentos que expondremos, acordamos expedir el recurso discrecional del título y revocar la decisión judicial impugnada.

Número Identificador

SEN2024_____

**I.**

El presente recurso tiene su génesis en dos reclamaciones civiles sobre daños y perjuicios, en los casos SJ2020CV06038[1] y SJ2020CV06113,[2] contra Transporte León LLC, su aseguradora Mapfre Praico Insurance Company y el señor Rafael E. Cotto Martínez (señor Cotto Martínez), entre otros demandados. A petición de Mapfre, el 11 de diciembre de 2020, ambas causas de acción fueron consolidadas.[3] Los hechos se relacionan con un accidente ocurrido el 6 de noviembre de 2020, en el que se vieron involucrados varios vehículos de motor. En síntesis, los reclamantes alegaron que sus autos fueron impactados por un camión Mack cargado, propiedad de Transporte León y conducido por el señor Cotto Martínez.

Transcurridos varios incidentes procesales, el 21 de diciembre de 2020, Mapfre presentó su *Contestación a demanda enmendada, reconvención y demanda contra terceros de interpleader bajo la Regla 19 de las de Procedimiento Civil*.[4] En esencia, solicitó el procedimiento provisto por la referida norma procesal,[5] ya que era objeto de múltiples reclamaciones por el mismo accidente y éstas excedían el monto de la cubierta.

---

[1] Apéndice del recurso, págs. 1-6.

[2] Apéndice del recurso, págs. 7-11; además, *Demanda enmendada* 12-16; *Segunda demanda enmendada* 78-85.

[3] Véase, Apéndice de recurso, págs. 17-21; 22-23.

[4] Apéndice del recurso, págs. 24-37, anejos a las págs. 38-59.

[5] La Regla 19 de Procedimiento Civil, *Procedimientos para obligar a reclamantes adversos a litigar entre sí*, 32 LPRA Ap. V, R. 19, dispone, en parte, como sigue:
> Todas aquellas personas que tengan reclamaciones justiciables contra la parte demandante podrán ser unidas como partes demandadas y requerírseles para que litiguen entre sí dichas reclamaciones, cuando sean éstas de tal naturaleza que la parte demandante estaría o podría estar expuesta a una doble o múltiple responsabilidad. No será motivo para objetar a la acumulación el que las reclamaciones de los distintos reclamantes a los títulos en los cuales descansan sus reclamaciones no tengan un origen común o no sean idénticos sino adversos e independientes entre sí, o que la parte demandante asevere que no es responsable en todo o en parte de lo solicitado por cualquiera de las partes reclamantes. Una parte demandada expuesta a una responsabilidad similar puede obtener el mismo remedio a través de una reclamación contra coparte, contra tercero o una reconvención. (...)

Así las cosas, el 28 de septiembre de 2021, los demandantes contra coparte y demandados contra terceros Esterás-Nieves presentaron una *Demanda enmendada contra coparte.*[6] En ésta, adujeron que Asphalt respondía por los daños causados, ya que era el dueño de la carga que trasportaba el camión Mack. Explicaron que Asphalt compró más de 44 toneladas de arena procesada y contrataron a Transporte León para su acarreo desde Oriental Sand & Gravel en Yabucoa, vendedora del material, hasta las instalaciones de la parte peticionaria en Toa Alta. Así, pues, arguyeron lo que sigue:

.     .     .     .     .     .     .     .

Cuando Asphalt Solution y/o Super Asphalt, contrataron a Transporte León para que transportara la carga **éstos sabían, o debieron de haber sabido, que, Transporte León habría de designar a Cotto Martínez para conducir el Camión Mack** y el Furgón donde se habría de transportar la carga, y que: a) Cotto Martínez padece de alguna condición física y limitación que le imposibilita el uso de su brazo y mano derecha para conducir el Camión; b) esta limitación, requería que mientras Cotto Martínez conducía el Camión, él tenía que soltar el guía cada vez que iba a tirar un cambio con su mano izquierda; c) esta limitación dificultaba el manejo y control del Camión por Cotto Martínez, sobre todo cuando lo conducía a alta velocidad con una sola mano, que le requería soltar el guía cada vez que iba a tirar un cambio; d) Cotto Martínez acostumbraba conducir el Camión a alta velocidad; e) era una actividad irrazonablemente peligrosa que Cotto Martínez condujera el Camión bajo las circunstancias antes relatadas; y, f) bajo las circunstancias antes relatadas era previsible que Cotto Martínez perdiera el control mientras manejaba el Camión, y que causara graves daños a la propiedad, seguridad corporal y la vida de otras personas.[7] (Énfasis nuestro).

.     .     .     .     .     .     .     .

Por su parte, bajo los mismos supuestos, el 6 de octubre de 2021, los demandantes Neris-Ríos enmendaron su reclamación para incluir a Asphalt como demandado.[8] Plantearon que, al ocurrir la colisión vehicular múltiple, la parte peticionaria era el dueño de la

---

[6] Apéndice del recurso, págs. 91-113, anejos a las págs. 114-117. Además, véase, Apéndice del recurso, págs. 118-119; 120-123.

[7] Apéndice del recurso, pág. 101, acápite 46.

[8] Apéndice del recurso, págs. 126-138.

carga que el señor Cotto Martínez transportaba en el camión, en dirección a las instalaciones de Asphalt.

El 30 de noviembre de 2021, la parte peticionaria presentó su *Contestación a tercera demanda enmendada.*[9] En dicho escrito, Asphalt negó los hechos según expuestos en las reclamaciones. Alegó que el señor Cotto Martínez, quien realizaba servicios de transportista en beneficio de Transporte León, poseía una licencia de conducir válida y vigente para manejar el camión que estuvo involucrado en la colisión múltiple. Como defensa afirmativa, entre otras, sostuvo que el accidente fue causado por la negligencia exclusiva de terceras personas por las cuales no respondía.

Luego de un acuerdo transaccional entre Mapfre y varios demandantes,[10] los Esterás-Nieves presentaron una *Moción de sentencia sumaria parcial* el 31 de julio de 2023.[11] Unieron al escrito varios documentos, a saber: la licencia del camión Mack y del furgón, el informe de la Policía de Puerto Rico, las denuncias en contra del señor Cotto Martínez y la sentencia condenatoria, conduces de Oriental Sand & Gravel, la factura por servicios prestados de Transporte León a Asphalt, copia del Reglamento de Transporte Comercial, *infra*, así como fragmentos de las deposiciones tomadas al conductor y representantes de Transporte León, Asphalt y Oriental Sand & Grave.[12]

En suma, adujeron que el Reglamento de Transporte Comercial, *infra*, imponía los deberes mínimos con los que Asphalt debió cumplir, como comprador de la carga. Añadieron:

> Para evitar estos **riesgos peculiares**, tanto Transporte León, como Sand & Gravel, y **Asphalt**, tenían el **deber indelegable de no permitir a Cotto Martínez manejar**

---

[9] Apéndice del recurso, págs. 139-147.

[10] Apéndice del recurso, págs. 148-150.

[11] Apéndice del recurso, págs. 225-245, con anejos a las págs. 246-392.

[12] Cabe señalar que, el 1 de noviembre de 2023, el TPI dictó *Sentencia Parcial* en la que desestimó con perjuicio las causas de acción incoadas en contra del demandado Oriental Sand & Gravel, quien se limitó a vender y cargar la arena que transportó el furgón del camión siniestrado. Apéndice del recurso, págs. 433-440. Refiérase a la *Sentencia* confirmatoria, emitida el 18 de marzo de 2024 por este tribunal intermedio, en el caso KLAN202301010.

**el Camión Mack para acarrear el Furgón** objeto de este pleito, a menos que él estuviere debidamente calificado para ello. Todos ellos son cocausantes de la colisión objeto de este pleito porque de ellos haber cumplido con su deber indelegable de velar que el conductor del Camión Mack estuviera calificado para operarlo, ellos hubieran sabido que Cotto Martínez no estaba calificado, por lo que no podían permitirle que lo operara, y la colisión no habría ocurrido.[13] (Énfasis nuestro).

Entretanto, se celebró la conferencia con antelación a juicio.[14]

En el referido *Informe*,[15] en lo que es pertinente al caso que nos ocupa, los litigantes originales e interpelados estipularon los siguientes hechos, a los que suplimos énfasis:[16]

.    .    .    .    .    .    .    .

5. Al ocurrir la colisión vehicular múltiple, **Asphalt Solution era el dueño de la carga** que Cotto Martínez transportaba en el Furgón.

.    .    .    .    .    .    .    .

8. Al ocurrir la colisión vehicular múltiple, **Cotto Martínez fue contratado por Transporte León** para manejar el camión Mack que él conducía, o para transportar/acarrear el arrastre que transportaba, al ocurrir la colisión vehicular múltiple.

9. En o alrededor del día 6 de noviembre de 2020, **Asphalt Solution compró alrededor de 44.203 toneladas de arena procesada [a] Sand & Gravel**.

10. El día 6 de noviembre de 2020, **Transporte León recogió esta arena procesada para transportarla** de desde la planta de Sand & Gravel, en Yabucoa, a la planta de Asphalt Solution en Toa Alta, **según el acuerdo entre Transporte León y Asphalt Solution**.

11. En o alrededor del día 6 de noviembre de 2020, **por instrucciones y a requerimiento de Transporte León, Cotto Martínez condujo el Camión Mack**, arrastrando el furgón, y fue a recoger esta arena procesada en la planta de Sand & Gravel en Yabucoa, para transportarla hasta la planta de Asphalt Solution en Toa Alta.

12. De la investigación realizada por la Policía de PR surge que, el día 6 de noviembre de 2020, a eso de las 10:05 a.m., mientras el vehículo (#1) "Camión Mack", con arrastre, era **conducido por Cotto Martínez** en dirección de sur a norte por la carretera 52 y por el carril central, al llegar al km 2.5 jurisdicción de San Juan, y a **una velocidad no segura** y adecuada en una **carretera que está bajo construcción y debidamente**

---

[13] Apéndice del recurso, pág. 226.
[14] Apéndice del recurso, págs. 541-545.
[15] Apéndice del recurso, págs. 445-540.
[16] Apéndice del recurso, págs. 471-474.

**rotulada a 45mph (35 mph vehículos pesados** según la Ley 22 Art. 5.02 (F)).

13. De la investigación realizada por la Policía de PR surge que, **mediando negligencia al conducir**, por la cual Cotto Martínez **perdió el control de su vehículo** desviándose a la derecha al percatarse que **el tránsito estaba detenido debido a la congestión vehicular, intentando rebasar por el paseo**, [...][17]

. . . . . . . . .

23. **El "Camión Mack" que era manejado por Cotto Martínez** es uno de transmisión manual con múltiples cambios.

24. **Cotto Martínez padece de alguna condición física que le imposibilita el uso de su brazo y mano izquierda para conducir un camión**. Esta limitación, requiere que mientras Cotto Martínez conducía el "Camión Mack", él tenía que soltar el guía cada vez que iba a tirar un cambio.

Además, los contendientes estipularon los siguientes documentos, entre otros: la licencia de conducir del señor Cotto Martínez y su credencial federal (TWIC),[18] la licencia del camión Mack y la del furgón, el informe de la Policía de Puerto Rico, así como la autenticidad de las facturas, órdenes de compra y conduces producidos por Transporte León, Asphalt y Oriental Sand & Gravel.

Asphalt[19] incoó el 12 de diciembre de 2023 la *Oposición a Moción de sentencia sumaria parcial de los demandantes Ester[á]s-Nieves y Moción consolidada de sentencia sumaria en cuanto a los demandantes Neris-Ríos y Esterás-Nieves*.[20] Acompañaron su petición con el informe de la Policía de Puerto Rico, copia de la Ley 109, *infra*, fragmentos de las deposiciones tomadas a los representantes de Asphalt y Transporte León, la licencia del camión Mack, las licencias estatal y federal del señor Cotto Martínez, así

---

[17] Los enunciados del 13 al 22, inclusive, describen la colisión múltiple, según la investigación de la Policía de Puerto Rico.

[18] Siglas de Transportation Worker Identification Credential, que expide el gobierno federal.

[19] Previo a presentar su postura, Asphalt intentó infructuosamente que se tuviera por no puesta la petición de los Esterás-Nieves por éstos no haberlos emplazado. No obstante, el TPI resolvió que Asphalt había comparecido voluntariamente y había realizado actos sustanciales que implicaron la renuncia del emplazamiento. Véase, Apéndice del recurso, págs. 393-404; 416-424; 425-432; 441-444.

[20] Apéndice del recurso, págs. 550-605, con anejos a las págs. 606-723.

como las denuncias emitidas y la sentencia dictada en contra de éste.

Primero, la parte peticionaria controvirtió los hechos propuestos por los Esterás-Nieves, en los que se argüía la aplicación del Reglamento de Transporte Comercial, *infra*, a Asphalt. En particular, la parte peticionaria explicó:

. . . . . . . .

a. (...) El [Reglamento de Transporte Comercial], reglamento citado por la parte demandante para sustentar este hecho, en particular la Sección 1.04 **no define qué es un embarcador**. Además, dicho reglamento, va dirigido a reglamentar y fiscalizar las empresas del servicio público según definidas por el Art. 2 de la [Ley 109], incluyendo a las **empresas que se dedican a la transportación de carga mediante paga, funciones a las cuales Asphalt no se dedica**.

b. Incluso, estos hechos son una mera argumentación para llegar a una conclusión equivocada en derecho sobre quien debe ser considerado como "embarcador" sin tener alguna fuente jurídica que lo sostenga. Por tanto, la conclusión realizada por la parte demandante en estos hechos es improcedente pues no sólo es incorrecto que Asphalt es un embarcador de acuerdo con la propia letra del [Reglamento de Transporte Comercial] y la [Ley 109], sino que, según las disposiciones de estos, el [Reglamento de Transporte Comercial] no le es aplicable a Asphalt. Además, en la introducción de este reglamento se deja claro que su propósito es uniformar y recopilar en un mismo documento los requisitos de seguridad en el transporte y aquellas penalidades administrativas que enfrentaría una persona natural o jurídica al incumplir con estas.[21] (Énfasis en el original).

. . . . . . . .

Segundo, Asphalt solicitó la desestimación de las causas de acción en su contra, toda vez que no existían las circunstancias que permitían la imposición de responsabilidad. Esto es, conforme con los hechos del caso, Asphalt planteó que no respondía por los actos torticeros del empleado o contratista independiente, el señor Cotto Martínez, contratado, a su vez, por el contratista a quien Asphalt encomendó el transporte de la arena, es decir, Transporte León.

Mientras que los recurridos Neris-Ríos no presentaron postura alguna, el 2 de enero de 2024, los Esterás-Nieves instaron

---

[21] Apéndice del recurso, págs. 559-560.

en conjunto su *Oposición de Esterás et al. a Moción de sentencia sumaria de Asphalt; y Réplica a oposición de Asphalt a Moción de sentencia sumaria de Esterás et al.*[22] En dicho escrito, reiteraron argumentos similares a los de su solicitud e insistieron en que Asphalt era un *embarcador*. Para ello, citaron el Reglamento de Mercado Núm. 14, Reglamento 2156 de 30 de septiembre de 1976, del Departamento de Agricultura, dirigido a regular los embarques del café en Puerto Rico. En la aludida reglamentación, se define *embarcador* como "toda persona que embarque o envíe café desde Puerto Rico al exterior bien sea productor, elaborador, comprador, vendedor, agente o porteador". Art. I (h) del Reglamento 2156. Los Esterás-Nieves citaron también el Reglamento 7437 de 14 de diciembre de 2007, promulgado por el Departamento de Hacienda. En éste, se define *embarcador* como "la persona que envía el embarque al consignatario". A su vez, *consignatario* es definido como la "persona a la que se dirigen los artículos o mercancía para que la recoja personalmente o por medio de un barco, agente embarcador o cualquier otro intermediario". Art. 2001-1 (a) (4) (8) del Reglamento 7437.

Justipreciados los escritos dispositivos, el 19 de enero de 2024, el TPI notificó la *Resolución* aquí impugnada.[23] En ésta, consignó los siguientes **hechos no controvertidos**, a los que hemos impartido énfasis:

1. **Transporte León era el dueño registral del "Camión Mack", que era utilizado para arrastre y del transportador del furgón que éste arrastraba con carga** y que ocasionaron la colisión vehicular múltiple de esta acción. Transporte León era además el patrono del Sr. Cotto y el acarreador comercial de la carga que transportaba el Camión Mack.

2. **Asphalt Solutions Toa Alta, LLC. se dedica a la mezcla y manufactura de asfalto utilizado para la pavimentación de carreteras**.

---

[22] Apéndice del recurso, págs. 724-771, con anejos a las págs. 772-921.
[23] Apéndice del recurso, págs. 922-939.

3. Asphalt tenía una relación de negocios y/o contrató a Transporte León para que tuviera camiones disponibles para transportar el material que compraba de Oriental Sand & Gravel Inc. (Sand & Gravel).

4. **Cuando Asphalt contrató a Transporte León para el transporte de carga, Asphalt no le requirió que los choferes que Transporte León [ ] estuvieran en cumplimiento con las leyes y reglamentos de Puerto Rico, y cualificados para prestar esos servicios.**

5. Al ocurrir la colisión vehicular múltiple Rafael E. Cotto Martínez manejaba el "Camión Mack" que transportaba el Furgón.

6. **Al ocurrir la colisión vehicular múltiple, el Sr. Cotto era empleado o trabajaba para, o fue contratado por, Transporte León, para manejar el camión Mack que él conducía, y para transportar/acarrear el arrastre que transportaba.**

7. En o alrededor del día 6 de noviembre de 2020, **Asphalt compró a Sand & Gravel alrededor de 44.203 toneladas de arena procesada.**

8. En o alrededor del día 6 de noviembre de 2020, **Asphalt contrató a Transporte León para que transportara esta arena procesada desde la planta de Sand & Gravel, en Yabucoa, a la planta de éstas en Toa Alta.**

9. Al ocurrir la colisión vehicular múltiple, **Asphalt era el dueño de la carga** que compró a Sand & Gravel y que Cotto Martínez transportaba en el Furgón del Camión Mack.

10. En o alrededor del día 6 de noviembre de 2020, Sand & Gravel vendió a Asphalt, despachó en el camión y/o entregó al Sr. Cotto la carga que él transportaba por medio del Camión Mack.

11. El día 6 de noviembre de 2020, **por instrucciones y a requerimiento de Transporte León, Cotto Martínez condujo el Camión Mack**, arrastrando el Furgón, y **fue a recoger esta arena procesada** en la planta de Sand & Gravel en Yabucoa, **para transportarla hasta la planta de Asphalt en Toa Alta.**

12. **El Sr. Cotto, se declaró culpable de conducir el 6 de noviembre de 2020, el Camión Mack con arrastre**, en dirección de sur a norte por la carretera 52 **a una velocidad que no le permitió mantener el debido control y dominio; de forma ilegal, imprudente y en menosprecio a la seguridad.**

13. El Camión Mack, que era manejado por Cotto Martínez es uno de transmisión manual con diez cambios.

14. **El Sr. Cotto no puede manipular o agarrar el guía, ni tirar cambios con su mano izquierda.**

15. Cuando Cotto Martínez conducía el "Camión Mack", su impedimento físico causaba que cada vez que él iba a tirar un cambio, él tenía que soltar el guía que aguantaba con su mano derecha, usar la mano derecha para manipular la palanca de cambios, soltar la palanca con la que agarraba la palanca [*sic*] para agarrar y maniobrar el guía con esa mano.

16. Cuando Cotto Martínez soltaba el guía con su mano derecha, él procedía a tratar de aguantar el guía con su muslo izquierdo subiendo su pierna hacia el guía, mientras usaba su mano derecha para manipular los cambios.[24]

.    .    .    .    .    .    .    .

20. Cuando tomó el examen para obtener su licencia de conductor, **Cotto Martínez no tomó ni tuvo que aprobar una prueba de manejo conduciendo un camión de cambios, tal como el Camión Mack**.

21. **Transporte León no le requirió a Cotto Martínez que produjera un certificado médico o una dispensa que certificara que él estaba físicamente cualificado para conducir el Camión Mack**.

22. La única información que Sand & Gravel le solicitaba a Cotto Martínez que le proveyera previo a la entrega de la carga era el número de tablilla del Camión Mack.

23. Previo a entregarle la carga el día de la colisión, Sand & Gravel no le requirió a Cotto Martínez que produjera un certificado médico o una dispensa que certificara que él estaba físicamente cualificado para recibir la carga y manejar el Camión.

24. Previo al día de la colisión, **Cotto Martínez había transportado carga comprada por Asphalt a Sand & Gravel**, embarcada por Sand & Gravel, y entregada a Asphalt para desembarque en, por lo menos, los días: 13, 19, 21 y 23 de octubre de 2020.

25. Cuando Cotto Martínez entregaba la carga, **la única documentación que Asphalt le solicitaba que le proveyera era el conduce para la firma**, y Asphalt se quedaba con una copia.

26. Super Asphalt Pavement Corp., y Asphalt Solutions Toa Alta LLC., son corporaciones organizadas bajo las leyes de Puerto Rico que **se dedican, entre otros negocios, a la mezcla, manufactura y colocación de asfalto para la pavimentación de carreteras**.

27. Super Asphalt Pavement Corp. y Asphalt Solutions Toa Alta LLC., **no se dedican al transporte terrestre de agregados o mercancía, ni de pasajeros**.

28. **Asphalt no es patrono, empleado, conductor, acarreador público o privado, embarcador, ni posee vehículos de motor comercial que transporten**

---

[24] Los enunciados del 17 al 19, inclusive, se refieren a citas del Reglamento para el Transporte Comercial.

**bienes o pasajeros en el comercio interestatal o intraestatal**.

29. **Transporte León**, LLC., es una corporación organizada bajo las leyes de Puerto Rico que **se dedica al transporte terrestre de agregado o mercancía por toda la isla, que lleva aproximadamente 40 años de experiencia** en este tipo de negocio.

30. Para el 6 de noviembre de 2020, **Asphalt tenía una relación de negocios con Transporte León** LLC., desde el 2017, la cual **consistía únicamente en el recogido y transporte de la mercancía adquirida por Asphalt**.

31. Según alegado en la *Tercera Demanda Enmendada*, el accidente ocurrió el 6 de noviembre de 2020 en la autopista Luis A. Ferrer, también conocido como el expreso 52, en dirección hacia el Municipio de Caguas. **El demandante Neris alega que se encontraba a fuera de su vehículo de motor en el área del paseo de la referida autopista, cuando recibió un impacto por su auto provocado por el camión marca Mack 600, modelo RD600 del año 1999**.

32. Según alegado en la *Demanda Enmendada contra Coparte*, **la demandante Cynthia Ester[á]s Nieves se encontraba detenida en su vehículo de motor en el carril derecho en el expreso 52, cuando fue impactada por un camión Mack 600 RD600 del año 1999, propiedad de Transporte León**, el cual era conducido por el codemandado Cotto Martínez, empleado de Transporte.

33. Para el 6 de noviembre de 2020, **el codemandado Cotto Martínez, no era empleado de Asphalt, ni tenía relación contractual con Asphalt**.

34. Para el 6 de noviembre de 2020, **el camión marca Mack** 600, modelo RD600 del año 1999, incluyendo su furgón, **era propiedad de Transporte León**, LLC.

35. Para el 6 de noviembre de 2020, **el camión marca Mack** 600, modelo RD600 del año 1999, incluyendo su furgón, **no era propiedad de Asphalt**.

36. Para el 6 de noviembre de 2020, el camión marca Mack 600, modelo RD600 del año 1999, **era conducido por el Sr. Rafael Cotto Martínez, contratado por Transporte León**.

37. **Asphalt no tenía conocimiento sobre la forma y manera en que Rafael Cotto Martínez conducía los camiones de Transporte León LLC., para transportar la mercancía comprada por Asphalt, incluyendo si éste lo hacía a exceso de velocidad**.

38. **El Sr. Francisco Arias Rodríguez, vicepresidente y representante de Asphalt, desconoce quién es el Sr. Rafael Cotto Martínez y los impedimentos físicos que este pudiese adolecer**.

39. Para el 6 de noviembre de 2020, **el Sr. Rafael Cotto Martínez contaba con su licencia de conducir vigente**, número 7007371, **tipo 9 "Vehículo Heavy"**, **expedida por el Departamento de Transportación y Obras Públicas de Puerto Rico**.

40. Para el 6 de noviembre de 2020, **el Sr. Rafael Cotto Martínez contaba con una licencia del Departamento de Transportación Federal** conocida como Transportation Worker Identification Credential ("TWIC"), con fecha de expiración del 12 de abril de 2023.

41. Rafael E. Cotto Martínez fue acusado y sentenciado por el delito de Ley 22 Art. 5.07 (b) menos grave, por el cual se declaró culpable de haber conducido el camión MACK a una velocidad tal que no le permitió ejercer el debido control y dominio del volante, sin hacer mención alguna sobre su condición física en el brazo izquierdo.

42. La Policía de Puerto Rico investigó la escena del accidente y en el Narrativo del Accidente se anotó que el Sr. Cotto conducía el camión "a una velocidad no segura y adecuada en una carretera que esta (sic) bajo construcción y debidamente rotulada…"

43. Para el 6 de noviembre de 2020, **Asphalt compró a Oriental Sand & Gravel una carga consistente en 44.203 toneladas de arena procesada** para ser transportada a la planta de Toa Alta.

44. La Policía de Puerto Rico investigó y examinó el camión Mack 600 RD600 y su furgón, y determinó que **la carga transportada no era una peligrosa**.

45. La Policía de Puerto Rico investigó y examinó el camión Mack 600 RD600 y su furgón, y determinó que este **no tenía ningún defecto mecánico**.

En cuanto a las **controversias** pendientes de resolución, que a juicio del TPI justificaban la celebración de una vista en sus méritos, se esbozó:

> …no existe una determinación de hechos o estipulación que establezca cuál fue la causa única del accidente y/o si existieron causas adicionales que contribuyeron o no al mismo. Por otro lado, lo cierto es que, de las alegaciones de las demandas también se le imputa responsabilidad por tener conocimiento de que el conductor tenía limitaciones físicas que dificultaban el control del vehículo y la forma de manejarlo, y no exigió que su contratista tomara medidas de seguridad para evitar que transportara su carga.
>
> .    .    .    .    .    .    .    .
>
> …podemos señalar que está en controversia si a la luz de las entregas previas del Sr. Cotto a Asphalt, estos conocían la existencia de las limitaciones físicas del chofer que alegadamente [*sic*] le impedían conducir adecuadamente. Además, si sabían que no podía utilizar su mano; quiénes en representación de Asphalt

lo vieron, si alguien; qué posición ocupaban en la empresa las personas que lo vieron o podían haberlo visto; si alguna de esas personas tenía el deber de notificarlo o lo notificaron a la gerencia para que tomara medidas; si a pesar de conocer que el chofer tenía un impedimento que no le permitía el uso de su brazo y mano izquierda para conducir y por tanto tenía que soltar el guía cada vez que iba a tirar un cambio, pidieron a su contratista que tomara medidas o no utilizara ese chofer para sus entregas; qué medidas de previsión tomo Asphalt para asegurarse que Transporte León tuviera choferes capacitados para el transporte; etc.

.    .    .    .    .    .    .    .    .

...si Asphalt incurrió en omisiones ante un deber jurídico de actuar lo que causó un daño.

.    .    .    .    .    .    .    .    .

A tenor de lo anterior, el TPI declaró No Ha Lugar ambas peticiones de sentencia sumaria incoadas por los Esterás-Nieves y Asphalt. No conteste, el 5 de febrero de 2024, Asphalt presentó *Moción de reconsideración y en Solicitud de enmienda a determinaciones de hechos.*[25] No obstante, el 6 de febrero de 2024, el TPI notificó una *Orden,* en la que declaró No Ha Lugar la solicitud para reconsiderar su determinación.[26] Aún inconforme, el 4 de marzo de 2024, Asphalt acudió oportunamente ante este tribunal intermedio, mediante el recurso discrecional de autos, y señaló la comisión de los siguientes errores:

**Primer Error:** Erró el TPI al no enmendar las determinaciones de hecho señaladas a pesar de que las propuestas por Asphalt se sostenían en prueba fehaciente sin ser realmente controvertidas y las de Esterás-Nieves son interpretaciones erróneas de hechos y derecho.

**Segundo Error:** Erró el TPI y abusó de su discreción al no desestimar sumariamente las causas de acción contra Asphalt cuando la aplicación del derecho vigente a las determinaciones de hecho establece que los peticionarios no responden por la negligencia incurrida por el contratista de su contratista independiente.

Por su parte, el 13 de marzo de 2024, los recurridos Esterás-Nieves presentaron su alegato. En cuanto a la parte recurrida Neris-Ríos, pendiente el caso que nos ocupa, el 12 de abril de 2024, éstos

---

[25] Apéndice del recurso, págs. 940-953.
[26] Apéndice del recurso, págs. 954-955.

desistieron de su reclamación contra Asphalt. En consecuencia, el 16 de abril de 2024, el TPI notificó una *Sentencia* de desistimiento y ordenó la desconsolidación del caso SJ2020CV06038.[27]

De igual modo, el 23 de abril de 2024, Asphalt interpuso una *Moción en auxilio de jurisdicción*, toda vez que el juicio en su fondo está pautado para el 6 al 17 de mayo de 2024.

Así, pues, evaluados el expediente ante nos y las posturas de los comparecientes, resolvemos.

**II.**

**A.**

El auto de *certiorari* es un vehículo procesal que permite a un tribunal de mayor jerarquía revisar las determinaciones judiciales de un foro inferior y corregir algún error cometido por éste. *800 Ponce de León v. AIG*, 205 DPR 163, 174 (2020); *IG Builders et al., v. BBVAPR*, 185 DPR 307, 337-338 (2012); *García v. Padró*, 165 DPR 324, 334 (2005). A diferencia de la apelación, el foro revisor tiene la facultad para expedir o denegar el recurso de *certiorari* de manera discrecional. *García v. Padró, supra.* El Tribunal Supremo de Puerto Rico ha definido *discreción* como el "poder para decidir en una u otra forma, esto es, para escoger entre uno o varios cursos de acción". *Id.*, que cita a *Pueblo v. Ortega Santiago*, 125 DPR 203, 211 (1990). Por ende, la discreción es "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera…" *Pueblo v. Sánchez González*, 90 DPR 197, 200 (1964), citado con aprobación en *García v. Padró, supra*, págs. 334-335.

No obstante, el ejercicio de la discreción no equivale a hacer abstracción del resto del Derecho, ya que ese proceder constituiría, en sí mismo, un abuso de discreción. *Negrón v. Srio. de Justicia*, 154 DPR 79, 91 (2001). Por lo tanto, el examen al auto discrecional que realizamos antes de decidir el curso a seguir no se da en el vacío ni

---

[27] Véase, *Moción Informativa* de 23 de abril de 2024 y los documentos anejados.

en ausencia de otros parámetros. *800 Ponce de León v. AIG, supra*, pág. 176. Ello así, porque "el adecuado ejercicio de la discreción judicial está inexorable e indefectiblemente atado al concepto de la razonabilidad". *García v. Padró, supra*, pág. 335; *Pueblo v. Ortega Santiago, supra*.

Es sabido que la Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1, delimita las instancias en las cuales este foro intermedio tiene autoridad para atender los recursos de *certiorari*. En su parte pertinente, la norma dispone como sigue:

.      .      .      .      .      .      .      .

> El recurso de *certiorari* para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, **solamente será expedido por el Tribunal de Apelaciones cuando se recurra** de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria **de una moción de carácter dispositivo**. (...) (Énfasis nuestro).

La regla procesal fija taxativamente los asuntos aptos para la revisión interlocutoria mediante el recurso de *certiorari*, así como aquellas materias que, por excepción, ameritan nuestra intervención adelantada, ya fuese por su naturaleza o por el efecto producido a las partes. *800 Ponce de León v. AIG, supra*, pág. 175.

Además del examen objetivo antes descrito, para ejercer sabia y prudentemente nuestra facultad discrecional al determinar si expedimos o denegamos un recurso de *certiorari*, nos guiamos por la Regla 40 del Reglamento del Tribunal de Apelaciones, *Criterios para la expedición del auto de certiorari*, 4 LPRA Ap. XXII-B, R. 40.

> El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> (A) **Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho**.
>
> (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) **Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración**.

(F) **Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio**.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia. (Énfasis nuestro).

Claro está, es norma asentada que este tribunal intermedio no interviene con las determinaciones emitidas por el foro primario ni sustituye su criterio discrecional, "*salvo que se pruebe que dicho foro actuó con prejuicio o parcialidad, incurrió en craso abuso con el ejercicio de la discreción, o que incurrió en error manifiesto*". (Cursivas en el original). *Citibank et al. v. ACBI et al.*, 200 DPR 724, 736 (2018), que cita con aprobación a *Ramos Milano v. Wal-Mart*, 168 DPR 112, 121 (2006); *Rivera y otros v. Banco Popular*, 152 DPR 140, 155 (2000); *Meléndez Vega v. Caribbean Int'l. News*, 151 DPR 649, 664 (2000); *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986). Véase, además, *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013).

**B.**

La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36, gobierna el mecanismo de la sentencia dictada sumariamente. Esta herramienta procesal sirve al propósito de aligerar la conclusión de los pleitos, sin la celebración de un juicio en sus méritos, siempre y cuando no exista una legítima controversia de hechos medulares, de modo que lo restante sea aplicar el derecho. Véase, *Jusino et als. v. Walgreens,* 155 DPR 560, 576 (2001); *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 676 (2018); *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 109 (2015). Así se propende a la solución justa, rápida y económica de los litigios de naturaleza civil en los cuales no exista una controversia genuina de hechos materiales. *Pérez Vargas v.*

*Office Depot*, 203 DPR 687, 699 (2021). En este sentido, un hecho material "es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". *Meléndez González et al. v. M. Cuebas, supra*, pág. 110. Por ello, "**[l]a controversia debe ser de una calidad suficiente como para que sea necesario que un juez la dirima a través de un juicio plenario**". (Énfasis nuestro). *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010).

La Regla 36.2 del mismo ordenamiento procesal, establece que la parte contra la cual se haya formulado una reclamación podrá presentar "una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación". 32 LPRA Ap. V, R. 36.2. Por su lado, conforme la Regla 36.3 de Procedimiento Civil, *supra,* en su contestación, la parte promovida "no podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar en forma tan detallada y específica, como lo haya hecho la parte promovente. De no hacerlo así, se dictará la sentencia sumaria en su contra si procede". 32 LPRA Ap. V, R. 36.3 (c). Asimismo, la Regla 36.3 de Procedimiento Civil, *supra*, establece unos requisitos de forma a ser cumplidos por la parte promovente y la parte promovida. 32 LPRA Ap. V, R. 36.3; Véase, *Pérez Vargas v. Office Depot, supra*, pág. 698. Por consiguiente, el incumplimiento del promovente de estas formalidades acarrea que el tribunal no esté obligado a considerar su pedimento. *Meléndez González et al. v. M. Cuebas, supra*, pág. 111**.** En caso de que el promovido sea quien incumple dichos requisitos "el tribunal puede dictar Sentencia Sumaria a favor de la parte promovente, si procede en derecho". *Id.*

Ahora bien, la sentencia sumaria sólo debe dictarse en casos claros. Por tanto, cuando no existe una certeza prístina sobre todos los hechos materiales que motivaron el pleito, no procede que se dicte sentencia sumaria. *Pérez Vargas v. Office Depot*, *supra*, pág. 699 y los casos allí citados. Por ser éste un remedio de carácter discrecional, "[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de 'su día en corte', principio elemental del debido proceso de ley". *Mgmt. Adm. Servs. Corp. v. E.L.A.,* 152 DPR 599, 611 (2000). Siendo esto así, sólo procede que se dicte la sentencia sumaria "cuando **surge de manera clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el Derecho aplicable y el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia**". (Énfasis nuestro). *Meléndez González et al. v. M. Cuebas, supra,* págs. 109-110, que cita a *Const. José Carro v. Mun. Dorado*, 186 DPR 113 (2012). De haber alguna duda acerca de la existencia de una controversia sobre los hechos medulares y sustanciales del caso deberá resolverse contra la parte que solicita la moción, haciendo necesaria la celebración de un juicio. *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 DPR 115, 133 (1992).

En cuanto a la revisión de un dictamen sumario o la denegación de la resolución abreviada, este tribunal revisor se encuentra en la misma posición que el foro de primera instancia al determinar si procede o no una sentencia sumaria. Sin embargo, al revisar la determinación del tribunal primario, estamos limitados de dos maneras: (1) sólo podemos considerar los documentos que se presentaron ante el foro de primera instancia; y (2) sólo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, así como si el derecho se aplicó de forma correcta. Esto es, no estamos compelidos a adjudicar los hechos

materiales esenciales en disputa. *Vera v. Dr. Bravo,* 161 DPR 308, 334-335 (2004). El deber de adjudicar hechos materiales y esenciales es una tarea que le compete al Tribunal de Primera Instancia y no al foro intermedio.

A esos efectos, el Tribunal Supremo de Puerto Rico estableció el estándar específico que debemos utilizar como tribunal revisor al momento de evaluar determinaciones del foro primario en las que se conceden o deniegan mociones de sentencia sumaria. En lo pertinente, dispuso que "[l]a revisión del Tribunal de Apelaciones es una de *novo* y debe examinar el expediente de la manera más favorable a favor de la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor". *Meléndez González et al. v. M. Cuebas, supra,* pág. 118. Además, reiteró que por estar en la misma posición que el foro primario, debemos revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma recopilados en la Regla 36 de Procedimiento Civil. *Id.* Por lo cual, luego que culminemos nuestra revisión del expediente, de encontrar que en realidad existen hechos materiales y esenciales en controversia, debemos tener en cuenta el cumplimiento de la Regla 36.4 de Procedimiento Civil y exponer concretamente cuáles hechos materiales están controvertidos y cuáles están incontrovertidos. Por el contrario, de resultar que los hechos materiales y esenciales realmente están incontrovertidos, entonces **nos corresponde revisar *de novo* si el foro impugnado aplicó correctamente el derecho a los hechos incontrovertidos**. *Id.,* pág. 119. Al dictar una sentencia sumaria, este tribunal deberá realizar un análisis dual que consiste en: (1) analizar los documentos que acompañan la solicitud de sentencia sumaria y en la oposición, así como aquellos que obren en el expediente del tribunal; y (2) determinar si el oponente de la moción controvirtió algún hecho material y

esencial, o si hay alegaciones de la demanda que no han sido refutadas en forma alguna por los documentos. *Vera v. Dr. Bravo*, *supra*, pág. 333. Una vez realizado este análisis el tribunal no dictará sentencia sumaria si: (1) existen hechos materiales controvertidos; (2) hay alegaciones en la demanda que no han sido refutadas; (3) surge de los documentos que se acompañan con la moción una controversia real sobre algún hecho esencial; o (4) como cuestión de derecho no procede. *Id.*, págs. 333-334.

## C.

Como cuestión de umbral, el Artículo 1815 del Código Civil de 2020, 31 LPRA sec. 11720, dispone, en parte, que "[l]a responsabilidad extracontractual, tanto en su extensión como su naturaleza, se determina por la ley vigente en el momento en que ocurrió el acto u omisión que da lugar a dicha responsabilidad. [...]". Por tanto, visto que los hechos del caso acontecieron el 6 de noviembre de 2020, nos referiremos al hoy derogado Artículo 1802 del Código Civil de 1930, 31 LPRA ant. sec. 5141. La aludida disposición establecía que todo aquél que por acción u omisión cause un daño a otro vendrá obligado a repararlo, si ha mediado culpa o negligencia. Para poder reclamar daños y perjuicios bajo este articulado, el Tribunal Supremo ha expresado que el demandante debe establecer la existencia de estos tres requisitos: (1) la existencia de un daño real; (2) el nexo causal entre daño sufrido y la acción u omisión del demandado; y (3) que el acto u omisión es culposo o negligente. *Pérez et al. v. Lares Medical et al.*, 207 DPR 965, 976 (2021); *López v. Porrata Doria*, 169 DPR 135, 150 (2006).

Respecto al concepto de culpa y negligencia, nuestro más alto foro ha opinado que consiste en la:

> falta del debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. *López v. Porrata Doria, supra*, pág. 151; *Toro Aponte v. E.L.A.*, 142 DPR 464, 473 (1997).

Por otro lado, **la omisión genera responsabilidad civil extracontractual siempre y cuando dicha omisión constituya una conducta antijurídica imputable**. *Hernández Vélez v. Televicentro*, 168 DPR 803, 812 (2006); *Arroyo López v. E.L.A.*, 126 DPR 682, 686 (1990). Para determinar si se incurrió o no en responsabilidad civil por omisión, el Tribunal Supremo ha establecido que deben considerarse los siguientes factores: (i) la existencia o inexistencia de un **deber jurídico de actuar por parte del alegado causante del daño**; y (ii) si de haberse realizado el acto omitido se hubiera evitado el daño. *Hernández Vélez v. Televicentro, supra*; *Soc. Gananciales v. G. Padín Co., Inc.*, 117 DPR 94, 106 (1986).

Nuestro ordenamiento legal ha consignado que el deber de indemnizar presupone la existencia de un nexo causal. *Estremera v. Inmobiliaria Rac. Inc.*, 109 DPR 852, 856 (1980). **La relación causal entre el acto negligente y los daños producidos debe ser suficiente en Derecho**. *López Delgado v. Cañizares*, 163 DPR 119, 133 (2004). La teoría de la causalidad adecuada postula que no es causa adecuada toda condición sin la cual no se hubiese producido el resultado, sino **aquella que ordinariamente lo produce según la experiencia general**. *Pérez et al. v. Lares Medical et al., supra*, en la pág. 977; *López v. Porrata Doria*; en la pág. 151-152. En otras palabras, la cuestión se limita a determinar si la ocurrencia del daño era de esperarse en el curso normal de un suceso o si, por el contrario, éste queda fuera del cálculo. *Rivera Jiménez v. Garrido & Co. Inc.*, 134 DPR 840, 852 (1993).

En lo que respecta a la causa del epígrafe, la norma jurídica dispone que un contratista independiente es aquél que se compromete con otro a realizar un trabajo o prestar un servicio de acuerdo con sus métodos y maneras, libre de ser controlado o dirigido por el principal, en cuanto a la forma en que se realiza la

encomienda; siendo el contratista controlado o dirigido solamente en cuanto al resultado final. Véase, V. Schwartz, K. Kelly, D. Partlett; *Prosser, Wade and Schwartz's Tort*s, 11th ed., Foundation Press, 2005, pág. 668. El alto foro ha explicado la figura del contratista independiente como sigue:

> [c]uando la persona que emplea a **otra puede prescribir lo que se ha de hacer, pero no cómo ha de hacerse ni quién lo hará**, la persona que se obligue a hacer el trabajo es un 'contratista' (*contractor*) y no un 'empleado' (*servant*), aunque el trabajo haya de realizarse bajo la dirección y a satisfacción de personas que representan al que emplea. (Énfasis nuestro). *Atiles, Admor. v. Comision Industrial*, 68 DPR 115, 120 (1948).

De ordinario, "**[l]a responsabilidad impuesta a un empleador por los daños ocasionados por un contratista independiente constituye una excepción a la norma** a los efectos de que la obligación de reparar daños generalmente emana de un hecho propio. Nuestro ordenamiento únicamente impone responsabilidad por hechos ajenos de manera excepcional". (Énfasis nuestro). *Pons v. Engebreston*, 160 DPR 347, 356 (2003); véase Art. 1803 del Cód. Civil de 1930, 31 LPRA ant. sec. 5142. El empleador o principal, que contrata a un contratista independiente, será responsable solidariamente del daño que éste cause por su propia negligencia en la ejecución del trabajo si dicho daño fuera un **riesgo previsible para el empleador o principal y éste omitió tomar las precauciones especiales** que se requerían, en vista de los riesgos particulares de una obra. *López v. Gobierno Mun. de Cataño*, 131 DPR 694, 706 (1992); *Martínez v. Chase Manhattan Bank*, 108 DPR 515 (1979).

Así, pues, **el empleador del contratista no responde** por la negligencia corriente de éste, que resulte en daños a terceros, **ni por la inobservancia de precauciones de rutina**, que un contratista cuidadoso debe usualmente tomar. La responsabilidad del empleador gira en torno a **riesgos peculiares al trabajo que deba**

**realizarse** y que surgen de su naturaleza, contra los cuales una persona razonable reconocería la **necesidad de tomar precauciones especiales**. *Martínez v. Chase Manhattan Bank, supra,* págs. 522-523. A modo de ejemplos sobre los riesgos especiales que requieren un alto grado de cuidado, el Tribunal Supremo se ha referido a las labores relacionadas con la energía eléctrica y con el manejo de sustancias inflamables. *Pacheco v. A.F.F.,* 112 DPR 296 (1982); *Vda. de Delgado v. Boston Ins. Co.,* 99 DPR 714 (1971), citados en *Pons v. Engebreston, supra,* pág. 358.

**Tampoco responde el principal o empleador** por la negligencia del contratista independiente "**cuando ejerza la debida diligencia para asegurarse que la persona contratada cuenta con las destrezas y experiencia suficientes para llevar a cabo el trabajo**, por lo que es de esperar que tomará las medidas de precaución necesarias para evitar los riesgos que pueda ocasionar la obra. En tales circunstancias, **se entenderá que el empleador ha actuado como un hombre prudente y razonable al delegar las labores en una persona capacitada para llevar a cabo el trabajo**". (Énfasis nuestro). *Pons v. Engebreston, supra,* págs. 358-359.

Por consiguiente, al determinar si un empleador responde o no por los actos torticeros de su contratista independiente, habrá de observarse si el trabajo o servicio pactado podía o no crear un riesgo peculiar de daños a terceros; si, al momento de contratar al contratista independiente, el empleador previó dicho riesgo y adoptó precauciones especiales o procuró contratar a un contratista independiente perito, quien tomaría las medidas de precaución necesarias para prevenir los riesgos inherentes a la obra o servicio.

### D.

La Comisión del Servicio Público de Puerto Rico está facultada por la Ley 109 de 28 de junio de 1962, según enmendada, mejor conocida como *Ley de Servicio Público de Puerto Rico,* 27 LPRA sec.

1001 *et seq.* (Ley 109), para reglamentar y fiscalizar, entre otras, a las empresas "de vehículos privados dedicados al comercio, incluyendo todos los vehículos de motor comercial". Art. 14 de la Ley 109, 27 LPRA sec. 1101. En lo que concierne, el Artículo 2 del estatuto establece que el término *empresa de acarreo de carga en vehículos de motor* "[i]ncluye toda persona, que en su carácter de porteador público fuere dueña, controlare, explotare o administrare cualquier **vehículo de motor que se utilice para el acarreo de carga por cualquier vía pública terrestre**, independientemente de que tal acarreo se efectúe o no entre terminales fijos, o a través de rutas regulares o irregulares". (Énfasis nuestro). 27 LPRA sec. 1002 (l).

A base del poder delegado por la Ley 109 y con la intención de adoptar varias partes del Título 49 del Código de Reglamentos Federales, la Comisión promulgó el *Reglamento para el Transporte Comercial*, Reglamento 7470 de 4 de marzo de 2008 (Reglamento 7470). En la Sección 1.04 del Reglamento 7470 se establece a qué grupo de personas le será de aplicación esta normativa. Al respecto, dispone que la reglamentación aplicará a todo "patrono, empleado, **conductor, acarreador** público o **privado, embarcador y vehículo de motor comercial, que transporte bienes** o pasajeros **por el comercio** interestatal o **intraestatal**". (Énfasis nuestro). Por igual, la reglamentación define la figura del *acarreador* como:

> ...**una empresa** pública o **privada, dedicada a la transportación**. El término **acarreador** incluye los agentes, oficiales y representantes del acarreador así como a empleados **responsables de reclutar, supervisar, adiestrar o despacho de conductores**, esto incluye también a los empleados responsables de la instalación, inspección y mantenimiento del equipo y/o accesorios de un vehículo de motor para propósitos de este Reglamento, la definición de acarreador incluye el término patrono. (Énfasis nuestro). Sec. 390.5 (1) del Reglamento 7470.

Asimismo, la Parte 390 del Reglamento 7470, que versa acerca de las *Disposiciones reglamentarias sobre seguridad en el transporte,*

dispone en la Sección 390.3 sobre la aplicación general de la reglamentación. Ésta dice en el inciso (a) que "son aplicables a todos los patronos, empleados y **vehículos de motor comerciales que transporten propiedad** o pasajeros en el **comercio** interestatal e **intraestatal**. (Énfasis nuestro). Por igual, la Parte 392 del Reglamento 7470, sobre *Manejo de Vehículos de Motor*, establece en la Sección 392.1 que el alcance de las reglas de dicha parte aplica a "[t]odo **acarreador**, sus oficiales, agentes, representantes, y empleados **responsables de** la administración, mantenimiento, operación, o manejo de los vehículos de motor, o **la contratación**, supervisión, entrenamiento, asignación, o **despacho de los conductores deberán ser instruidos en y cumplir con las reglas de esta parte**". (Énfasis nuestro).

Es meritorio señalar que la Sección 391.1 del Reglamento 7470 impone un **deber mínimo a los acarreadores** sobre la cualificación de sus conductores. Esto incluye cerciorarse que sus conductores estén físicamente aptos según los requerimientos estatuidos en la Sección 391.41. Del mismo modo, la reglamentación citada define *accidente* como un suceso en el que está involucrado un vehículo de motor comercial en una vía pública que resulta en: (i) una muerte; (ii) una lesión corporal a una persona que requiera inmediatamente tratamiento médico fuera de la escena del accidente; o (iii) uno o más vehículos de motor que sufren daños inhabilitadores como resultado del accidente, requiriendo que el vehículo sea transportado fuera de la escena por una grúa. Sec. 390.5 (6) del Reglamento 7470.

### III.

En la causa del título, en esencia, Asphalt alega que el TPI erró al no desestimar sumariamente las causas de acción en su contra. Para ello, por ejemplo, sostiene que el TPI debió suprimir el lenguaje de la determinación de hecho 24, pues el uso de las

palabras *embarcada* y *desembarque* inducen a una interpretación errónea del Derecho, ya que no le son aplicables las normas del Reglamento 7470. Afirma también que, a base de la aplicación del Derecho vigente a las determinaciones de hecho, no responde por la negligencia incurrida por el contratista de su contratista independiente.

Por su parte, los recurridos Esterás-Nieves arguyen que Asphalt responde por sus daños, ya que actuó como *embarcador*. Aseveran que el Reglamento 7470 le aplica al peticionario y arguyen que Asphalt, para evitar riesgos peculiares, tenía el deber indelegable de no permitir al señor Cotto Martínez manejar el camión Mack para acarrear la carga de su propiedad.

Por su relación intrínseca, discutiremos en conjunto los señalamientos de error planteados por la parte peticionaria.

Examinados *de novo* las peticiones sumarias, sus oposiciones y los documentos anejados por los litigantes —quienes cumplieron sustancialmente con los rigores de la Regla 36 de Procedimiento Civil, *supra*— así como el dictamen recurrido, determinamos acoger las siguientes determinaciones fácticas que competen al asunto que atendemos.

Los hechos probados establecen que **Asphalt era el dueño de la carga**, consistente en poco más de 44 toneladas de arena procesada. El TPI consignó que esta carga **no era una peligrosa**, según resultó de la investigación cursada por la Policía de Puerto Rico, quien examinó el camión Mack y su furgón.

Para transportar la arena entre Oriental Sand & Gravel y las instalaciones de Asphalt sitas en Toa Alta, **el peticionario contrató a Transporte León**, **dueño registral del camión Mack**, quien contaba con una **experiencia de aproximadamente 40 años**, en el transporte terrestre de mercancía. El señor Carmelo León Colón indicó en la deposición sobre él y su hijo:

P. ¿Qué, qué puesto, si alguno, usted ocupa en, en la compañía?

R. Bueno, básicamente, que tenemos camiones en, en común y nos dedicamos al transporte de agregado a toda la isla y a diferentes compañías por, por espacio de bastantes años ya de experiencia, y como le indiqué, que es un negocio familiar.

P. Ah. ¿Cuando usted dice "familiar", usted y su hijo?

R. Sí.

P **¿Cuántos años me dice que tiene de experiencia, cuántos años llevan ustedes haciendo este tipo de negocio?**

R. **Bueno, por, por mi parte llevo alrededor de cuarenta años.**

P ¿Y por su hijo?

R. Bueno, mi hijo, pues, ya básicamente, siendo un poco... siendo más joven, alrededor de diez o doce años, digamos.[28] (énfasis nuestro).

El señor León Colón explicó que usualmente las compañías y clientes **solicitaban los servicios de Transporte León por teléfono e indicaban dónde recoger el material y a dónde se destinaba**. Los camiones y arrastres solían estar en las instalaciones de Transporte León.[29] Se determinó probado también que, **por instrucciones y a requerimiento de Transporte León, el señor Cotto Martínez condujo el camión Mack para trasladar la carga perteneciente a Asphalt** de un punto a otro. El señor León Colón atestiguó en la deposición que, previo al accidente, **el señor Cotto Martínez había prestado servicios a su compañía durante tres semanas;**[30] y acotó que lo conoció en un taller de mecánica de camiones. **El señor Cotto Martínez le mostró su licencia,**[31] **sin restricciones**; y ante una necesidad de conductores lo contrató, pues lo había observado manejando camiones de otras empresas.[32]

**El señor Cotto Martínez contaba con licencias para la conducción de camiones** como el siniestrado, a saber, tenía una licencia de conducir vigente, número 7007371, tipo 9 "Vehículo

---

[28] Apéndice del recurso, pág. 612 líneas 2-19.
[29] Apéndice del recurso, pág. 615 líneas 2-20.
[30] Apéndice del recurso, pág. 617 líneas 2-5.
[31] Apéndice del recurso, págs. 619-620.
[32] Apéndice del recurso, págs. 617 líneas 13-25; 618 líneas 1-14.

Heavy", expedida por el Departamento de Transportación y Obras Públicas de Puerto Rico y la TWIC con fecha de expiración el 12 de abril de 2023. Ahora, surge de los autos que el señor Cotto Martínez presentaba una condición física limitante en su brazo y mano izquierdos. En este caso, de la investigación policiaca y los propios dichos del chofer se desprendió que **el señor Cotto Martínez condujo el camión Mack con arrastre a una velocidad insegura e inadecuada en una carretera bajo construcción y debidamente rotulada**. Debido a esta negligencia al conducir a exceso de velocidad, el señor Cotto Martínez perdió el control de su vehículo e inició el choque en cadena.[33] De hecho, el señor Cotto Martínez se declaró culpable de conducir de forma negligente y a una velocidad que no le permitió mantener el debido control y dominio del camión.[34]

Por otra parte, quedó demostrado que Asphalt se dedica a la mezcla y manufactura de asfalto para la pavimentación de carreteras. Es meridianamente claro, según consignó el TPI, que **Asphalt no se dedica al transporte terrestre de agregados o mercancía**. **Tampoco es un embarcador**, conforme apostilló el TPI. El señor Francisco Arias Rodríguez, vicepresidente de Asphalt,[35] declaró en la deposición que, a su solicitud, al igual que con otras empresas similares,[36] Transporte León tenía los camiones disponibles para carga y, dependiendo de la necesidad, ellos cargaban la arena y la llevan a las plantas.[37] Además, testimonió:

> P. **¿Tuvo intervención usted con alguno de los choferes de Transporte León?**
> R. **No, con los choferes yo no intervengo**.
>
> . . . . . . . .
>
> P. (…) Según entiendo, dijo, ¿se le hace una llamada al transportista, el transportista se encarga de

---

[33] Apéndice del recurso, pág. 380.
[34] Apéndice del recurso, págs. 670-671. Véase, Artículo 5.07 de la Ley 22 de 7 de enero de 2000, según enmendada, 9 LPRA sec. 5127.
[35] Apéndice del recurso, pág. 356 líneas 12-16.
[36] Apéndice del recurso, pág. 607 líneas 12-18.
[37] Apéndice del recurso, pág. 358 líneas 7-14.

> recoger la carga y el transportista envía un chofer que la lleva a sus facilidades [*sic*]?
>
> R.    Eso es correcto.
>
> P.    ¿Y una vez llega a sus facilidades [*sic*], qué gestión, si alguna, realiza ese camionero que viene con esa carga a sus facilidades [*sic*]?
>
> R.    Pasa por la romana [*sic*] que tiene la evidencia del conduce y se entrega el conduce en la planta como evidencia de que dio el servicio.[38] (Énfasis nuestro).

Por ende, aun cuando el señor Cotto Martínez aseveró que había ido a la planta de Asphalt en varias ocasiones, éste sólo se bajaba a entregar la libreta de conduce y esperaba su turno para descargar.[39] Por ello, el representante de Asphalt no conocía ni tenía que conocer quién era el señor Cotto Martínez y los alegados impedimentos físicos. El TPI también encontró probado en la determinación 37 que "Asphalt no tenía conocimiento sobre la forma y manera en que Rafael Cotto Martínez conducía los camiones de Transporte León, para transportar la mercancía comprada por Asphalt, incluyendo si éste lo hacía a exceso de velocidad".

Según reseñamos, el TPI consignó de manera general ciertas controversias del pleito que impedían su dictamen abreviado. Indicó, por ejemplo, que debía auscultar acerca de causas adicionales del accidente, del imputado conocimiento de Asphalt con relación a las limitaciones físicas del señor Cotto Martínez y si el peticionario solicitó a Transporte León el uso de choferes capacitados. A nuestro juicio, todas estas cuestiones fácticas fueron contestadas con el resumen de hechos antes plasmado y el ordenamiento jurídico atinente. El TPI esgrimió otras cuestiones relacionadas con quiénes, en representación de Asphalt, vieron al señor Cotto Martínez, los puestos ocupados en la empresa y si tenían el deber de notificar algo a la gerencia para tomar medidas. Empero, lo cierto es que del *Informe sobre conferencia con antelación al juicio* no surge que la

---

[38] Apéndice del recurso, págs. 358 líneas 21-23; 359 líneas 7-17.
[39] Apéndice del recurso, págs. 373 líneas 1-6; 378-379.

parte recurrida haya anunciado evidencia testifical o documental suficiente para que el TPI pueda justipreciar las escuetas controversias que supuestamente le impidieron resolver por la vía de apremio sobre la imputada negligencia por omisión a la parte peticionaria. De hecho, aun cuando surja alguna evidencia, es incuestionable que el señor Cotto Martínez contaba con las credenciales necesarias para ejercer el oficio de conductor de camiones como el accidentado. Recuérdese que, de conformidad con nuestro ordenamiento probatorio, corresponde a la parte demandante la carga de probar la negligencia y no basta con alegarla. Regla 110 (A)-(B) de las Reglas de Evidencia, 32 LPRA Ap. VI. Es decir, en un caso de daños y perjuicios, en el que se alegue haber sufrido daños como consecuencia de la negligencia por omisión, el peso de la prueba respecto a la existencia de un deber jurídico de actuar le corresponde a la parte actora. Ello así, porque "[e]n materia de responsabilidad civil extracontractual, el hecho productor del daño nunca se presume". *Colón y otros v. K-mart y otros*, 154 DPR 510, 521 (2001) y los casos allí citados.

A tales efectos, colegimos que, a base de los hechos probados, el TPI debió resolver sumariamente las reclamaciones en contra de Asphalt, pues sólo le restaba aplicar el Derecho atinente a la controversia a dirimir, la cual se suscribe a si Asphalt, como empleador o principal, tenía o no un deber jurídico de actuar, cuya omisión fue la causa adecuada del daño. Respondemos en la negativa.

De entrada, de los hechos resumidos, debemos coincidir con el TPI al establecer que Asphalt no es patrono, empleado, conductor, acarreador público o privado, **embarcador**, ni posee vehículos de motor comercial que transporten bienes o pasajeros en el comercio interestatal o intraestatal. A esos efectos, **no le es de aplicación el Reglamento 7470**. Por ende, Asphalt no estaba compelido con

algún deber jurídico de actuar al palio de dicha reglamentación, cuya omisión constituya la causa adecuada de los daños sufridos por los recurridos Esterás-Nieves. Decididamente, el intento forzado de los recurridos de citar disposiciones reglamentarias exógenas resulta improcedente. Dicho esto, y a la luz de la normativa jurídica esbozada sobre los supuestos en que el empleador o principal incurre en negligencia, resolvemos que, en el caso de autos, Asphalt está eximido de responder. Veamos.

De conformidad con lo esbozado, **el empleador del contratista no responde** por la negligencia corriente de éste, al **no observar precauciones rutinarias**, que un contratista prudente y razonable tomaría; **a menos que existan riesgos peculiares a la obra o servicio a realizar,** que conlleven la adopción de **precauciones especiales**. De otro lado, se exime de responsabilidad al empleador o principal por la negligencia del contratista independiente cuando éste **se asegura que el contratista cuenta con la experiencia suficiente para llevar a cabo el trabajo o prestar el servicio**. Ello así, porque se espera que tiene el conocimiento y pericia para tomar las medidas de precaución necesarias con el fin de evitar los riesgos inherentes a la obra o servicio. Reiteramos las diáfanas expresiones del Tribunal Supremo de que "**se entenderá que el empleador ha actuado como un hombre prudente y razonable al delegar las labores en una persona capacitada para llevar a cabo el trabajo**". (Énfasis nuestro). *Pons v. Engebreston, supra,* págs. 358-359.

En este caso, el servicio de transportación intraestatal de un camión con una carga de arena procesada no crea un riesgo especial de daños a terceros, como lo podría ser la carga de material inflamable o peligroso. Precisamente, para compensar cualquier riesgo de una actividad rutinaria como la de transportar arena, el Estado regula la industria puntillosamente. Por ende, Asphalt no

tenía que tomar ni solicitar a Transporte León la adopción de precauciones particulares al solicitar el transporte de la arena procesada entre Oriental Sand & Gravel y la planta de Toa Alta, más allá de esperar que se utilizaran conductores licenciados. Claro está, si bien Asphalt no interviene ni tiene que intervenir sobre cómo Transporte León presta el servicio de transportación de mercancía, el peticionario sí procuró establecer relaciones comerciales con una empresa familiar con décadas de experiencia, de quien se esperaba que tomaría las medidas de precaución necesarias para prevenir los riesgos inherentes al servicio solicitado. A su vez, ni la naturaleza de la carga ni la forma y manera de cargar el camión establecieron peligros especiales extraordinarios. Por ello, precisamente Oriental Sand & Gravel fue eximido de responsabilidad.

En fin, no albergamos duda de que los recurridos Esterás-Nieves sufrieron daños provocados por el accidente múltiple, en el que estuvo involucrado un camión Mack, cargado con arena propiedad de Asphalt y conducido por el señor Cotto Martínez. Sin embargo, con respecto al peticionario, somos del criterio que no existe nexo causal entre el daño aducido y la supuesta negligencia por omisión imputada a Asphalt, toda vez que el peticionario no tenía un deber jurídico de actuar con relación a la contratación de choferes por parte de Transporte León. Como se sabe, los elementos de la acción de responsabilidad civil extracontractual deben concurrir para poder prevalecer en un pleito de daños y perjuicios. Opinamos que, en este caso, no sólo hay inexistencia de evidencia para demostrar por preponderancia de la prueba la alegada negligencia por omisión de Asphalt, sino que además la decisión del TPI está divorciada del Derecho vigente que exime a Asphalt, como empleador y principal, de responder por los daños aducidos.

Concluimos, en este caso, que los daños sufridos no se debieron a riesgos o peligros especiales, contra los cuales el

peticionario dejó de tomar precauciones adecuadas. Ciertamente, la causa adecuada de los daños sufridos por los recurridos Esterás-Nieves no está vinculada a omisión alguna del peticionario ni un deber de éste, en cuanto a la reconocida negligencia del señor Cotto Martínez al conducir el camión Mack. El chofer aceptó que no observó las precauciones de rutina, como lo es el conducir a una velocidad permitida. Una medida básica que todo conductor licenciado usualmente debe tomar al manejar un camión con arrastre. Precisamente, éste es el tipo de negligencia por la cual no responde el empleador o principal del contratista independiente. Nótese que Asphalt contrató a Transporte León el cual, sin la intervención de Asphalt, contrató al señor Cotto Martínez, quien ostentaba las licencias que el Estado exige para esa labor.

Tal como se infiere razonablemente de las determinaciones del TPI, la contratación para el acarreo de arena a nivel intraestatal no constituía una actividad que exigiera que Asphalt adoptara medidas especiales, pues dicha labor no representaba un peligro o riesgo peculiar previsible, capaz de ocasionar daños a terceros. Aun cuando pueda determinarse lo contrario, que sí tiene algún riesgo, lo cierto es que Asphalt fue diligente al contratar a un transportista experimentado para efectuar dicha labor. Por lo tanto, no era previsible para Asphalt que el conductor infringiría las leyes de tránsito ni, como empleador o principal, estaba compelido a verificar los atributos físicos de los choferes contratados por su contratista independiente, Transporte León.

En suma, no existe una fuente legal que obligue a Asphalt ni a su personal a cerciorarse, por encima de la pericia de las agencias gubernamentales, quienes le concedieron las licencias autorizadas correspondientes al señor Cotto Martínez, si éste se encontraba o no capacitado para conducir camiones. Al respecto, nuestro más alto foro ha expresado que, de acuerdo con nuestro esquema procesal

civil, es impermisible que "los tribunales aseveren lacónicamente que es inevitable verter la prueba en un juicio plenario cuando a todas luces la parte demandante no pudo establecer, como mínimo, los elementos de su causa de acción. Ir a juicio en esas circunstancias sería un ejercicio fútil". *Rodríguez Méndez et al. v. Laser Eye*, 195 DPR 769, 790-791 (2016).

Al tenor, colegimos que, según lo resuelto en *Pons v. Engebreston, supra,* y la jurisprudencia precedente, en ausencia de responsabilidad del empleador o principal por los daños causados por el contratista de su contratista, cuando no median riesgos especiales, apreciamos que el TPI cometió los errores imputados, al no declarar con lugar la petición sumaria presentada por Asphalt e incidió en su discreción al aplicar erróneamente el Derecho a las determinaciones fácticas probadas.

Consiguientemente, opinamos que, bajo ningún supuesto, puede imponerse responsabilidad a Asphalt por el accidente, toda vez que contrató con Transporte León, que cuenta con las destrezas y experiencias suficientes para prestar el servicio pactado. Asphalt no responde por los daños sufridos por los recurridos Esterás-Nieves. Cónsono con lo anterior, por ser ésta una etapa idónea para expedir el auto discrecional, toda vez que la determinación dispositiva recurrida es contraria a Derecho, con la salvedad de las palabras "embarcada" y "desembarque" de la determinación de hecho 24, procede acoger las aseveraciones fácticas enunciadas por el TPI, expedir el recurso de *certiorari* y revocar la *Resolución* impugnada.

**IV.**

Por los fundamentos antes expuestos, los cuales hacemos formar parte de este dictamen, expedimos el recurso de *certiorari* y revocamos la *Resolución* recurrida. En consecuencia, decretamos la desestimación, con perjuicio, de la *Demanda enmendada contra*

*coparte* de los recurridos Esterás-Nieves, en contra de Super Asphalt Pavement Corp. y Asphalt Solutions Toa Alta, LLC.

Al palio del dictamen pronunciado, declaramos sin lugar la *Moción en auxilio de jurisdicción* por tornarse académica.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones